# Exhibit 1

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**
_____

In the Matter of the Arbitration between:


Olav Bergheim and Morteza Gharib,
                    Claimants,                )
                                                         )
         - and -                                  )    Case No. *13-20-1300-2448*
                                                         )
                                                         )
Sirona Dental Systems, Inc.                )
and Arges Imaging, Inc.,                    )
                    Respondents.            )

_____

**FINAL AWARD**

      **I, THE UNDERSIGNED ARBITRATOR**, having been duly designated in accordance with the arbitration agreement contained in the Agreement and Plan of Merger By and Among Sirona Dental Systems, Inc., AI Merger Corp., Arges Imaging Inc. and Representatives executed on May 5, 2011 (the "Agreement') and having been duly sworn, and having duly heard the proofs, allegations, and arguments by the parties, do hereby issue this **FINAL AWARD**.

## I.   THE PARTIES AND THEIR COUNSEL

      Claimant Olav Bergheim ("Mr. Bergheim") is the founder and managing director of Fjord Ventures LLC, a former shareholder of Arges Imaging, Inc., and also a shareholder representative of the former Arges shareholders under the Agreement. Morteza Gharib ("Dr. Gharib") is the Vice Provost, Hans W. Liepman Prof. of Aeronautics and professor of Bio-Inspired Engineering at California Institute of Technology. Dr. Gharib is also a former Arges shareholder. and serves as a shareholder representative of the former Arges shareholders under the Agreement. Mr. Bergheim and Dr. Gharib (collectively "Claimants") as the representatives of the former Arges shareholders are specifically empowered, pursuant to section 2.01 of Exhibit 8.01(p) of the Agreement, to bring and maintain all of the claims asserted on behalf of all former Arges shareholders.

      Respondent Arges Imaging, Inc. ("Arges") is a Delaware corporation with its principal place of business in California and is now a wholly-owned subsidiary of Respondent Sirona Dental Systems, Inc.

1

("Sirona" and together with Arges "Respondents"). Arges is engaged in the business of developing and commercializing hardware and software for generating 3-D surface data for dental applications. Sirona is the market leader for CAD/CAM and leads in the field of dental technology, manufacturing, and development and manufactures and markets a complete line of dental products including CAD/CAM restoration systems (CEREC), digital intraoral Panoramic and 3-D imaging systems, dental treatment centers, handpieces and hygiene systems.

Claimants were initially represented by John Roesser and other counsel at Alston & Bird LLP. During the pendency of the arbitration Mr. Roesser moved to Arnold & Porter LLP where he continued the representation assisted by Anne Brooksher-Yen and Ehsan Ali. Respondents were represented by Mark A. Robinson and Peter Guirguis of Norton Rose Fulbright US LLP.

## II. PROCEDURAL BACKGROUND

### a. The pleadings and the hearing

Claimants filed their initial demand dated November 19, 2013. Respondents filed their answer on December 16, 2013. The Tribunal was constituted in January 2014. By agreement of the parties the hearing was scheduled for December 2014. In September 2014 Claimants moved to amend their complaint based on their assertions relating to evidence they had discovered in the course of a deposition of a former Arges employee. Claimants argued that they would be asserting their new claim in any case, and it would be more efficient and cost-effective to have all of their allegations heard in the same proceeding. The application to allow the amendment was opposed by Respondents.

Persuaded that the goals of efficiency and cost reduction would be achieved by resolving all of the disputes between the parties in one forum and in a single proceeding, the Tribunal granted the motion. The proposed amended demand became the operative pleading upon the granting of the motion to amend in October 2014 (the "Amended Demand"). Respondents filed an Answer to the Amended Demand on December 12, 2014 (the "Amended Answer"). To allow for preparation for a hearing on the amended pleadings the hearing date was adjourned to April 2015. Due to delays occasioned by the necessity to comply with German privacy laws for the documents to be produced from the files in Sirona's German facility, it was necessary to adjourn the hearing again to October 2015.

The hearing on the merits was conducted in New York City on October 7, 8, 9, 12, 13 and 14, 2015. The following witnesses who had submitted written witness statements on behalf of Claimants

testified in person and were subject to cross examination at the hearing: Mr. Bergheim (primary negotiator for Arges prior to the merger) and Dr. Gharib (inventor of the Arges technology). Claimants also submitted a witness statement from Hugh Neuharth (former CFO of Arges) and Kim Karpowitz ("Mr. Karpowitz") (owner of Digital Dental Labs) who were not called for cross examination by Respondents and did not testify. In addition, Claimants presented Tulin Erdem as a marketing expert and Gordon Klein as a damages expert.

The following witnesses who had submitted written witness statements on behalf of Respondents testified in person and were subject to cross examination at the hearing: Joachim Pfeiffer (chief technology officer of Sirona and vice president of CAD/CAM systems), Michael Augins (president of Sirona Dental, Inc.), Ronny Kucharczyk (product manager for digital impression), Ingo Zimmer (director of clinical CAD/CAM), Norbert Ulmer (manager of Sirona's internal inlab sales force). In addition, Respondents presented Donald House as an expert witness.

In addition, David Licata ("Mr. Licata") (COO and principal executive officer of Arges prior to the acquisition who continued as general manager of Arges after the merger until January 2015) was called as a witness pursuant to a subpoena issued by Claimants and testified at the hearing.

Numerous documents were entered into evidence at the hearings and discussed in the witness statements. Opening statements were presented. Claimants and Respondents submitted Pre-Hearing and Post-Hearing briefs and submitted their Application for Costs and Fees. Oral argument was conducted on November 18, 2015. The hearing was closed following the issuance of the final transcript on December 3, 2015.

**b. Jurisdiction, rules and applicable law**

Section 11.16 of the Agreement provides that any dispute (with certain exceptions not relevant here) arising out of or relating to the Agreement shall be determined by arbitration. No party challenged the Tribunal's jurisdiction to determine the claims asserted.

In accordance with the provisions of the Agreement the rules governing the arbitration are the Commercial Arbitration Rules of the American Arbitration Association (AAA) as supplemented by the AAA's Procedures for Large, Complex Commercial Disputes, as in effect on October 1, 2013.

As specified in the Agreement, Delaware law, without giving effect to any choice of law or conflict of law provisions controls the Agreement.

### III. THE ISSUES PRESENTED

The Tribunal requested that the parties identify the issues to be tried. Claimants submitted 133 issues and Sirona submitted 48 issues to be tried and resolved by the Tribunal. The Tribunal has carefully reviewed each of the issues so identified and finds that they are all detailed questions that pertain to the claims asserted and present the following issues:

Did Respondents breach the Agreement by failing to pay the accuracy earn out?

Did Respondents breach the Agreement by failing to fulfill their contractual obligations with respect to the revenue earn out?

Did Respondents breach the covenant of good faith and fair dealing?

Did Respondents fraudulently induce Claimants to enter into the agreement, either by misrepresentation or omission?

Are Claimants entitled to recovery for unjust enrichment?

Claimants seek a recovery of (i) $3 million with respect to their claim for the accuracy earn out, (ii) $2.3 million to $64 million on their other claims depending on the theory of recovery pursued and the assumptions made. Claimants further seek the recovery of interest, attorney's fees and costs.

Respondents deny all liability and seek the recovery of their attorney's fees and costs.

### IV. THE FACTUAL BACKGROUND

The Tribunal has received and considered extensive evidence presented by the parties concerning the factual background of this dispute. All of this evidence has been taken into account in reaching the Tribunal's ultimate conclusions. The parties are familiar with this evidence. The following discussions of the facts mention the salient events to provide context for this Award and reflect certain undisputed facts, certain facts found by the Tribunal based on the evidence and certain contentions of the parties. It is not intended to represent a comprehensive or complete narrative of all of the information that the Tribunal has considered and evaluated.

#### a. CAD/CAM

CAD/CAM stands for computer-assisted design and computer-assisted manufacturing. Dental CAD/CAM products replace traditional methods of creating dental restorations of natural teeth. The

traditional method of creating a dental restoration involves a dentist first taking a physical impression of a patient's teeth from inside the patient's mouth by having the patient bite into impression material which is then sent to a dental lab to create the restoration. A dental CAD/CAM system starts with the dentist using a digital scanner (a camera) to take a digital impression of the tooth. After that the restoration can either be created by the dentist with a computerized milling machine in the office, known as a chairside restoration, or it can be sent to a dental lab to create the restoration, also known as a digital impression device or "DI."

For about 30 years Sirona has been marketing and selling a CAD/CAM system for single visit dentistry called CEREC which stands for ceramic reconstruction. Sirona is the market leader for CAD/CAM products.

The CAD/CAM market contains three basic segments: (1) digital impression known as DI are standalone intraoral scanners, which allow the dentist to capture high resolution 3-D images and export those images to dental labs (this was the Arges product); (2) chairside systems which are full systems that have the capability to take intraoral scans and manufacture the relevant dental implants on-site; and (3) lab units which accept the digital images and mill the restoration.

### b.  Sirona's CAD/CAM product line

Sirona's CAD/CAM for Everyone brochure set out Sirona's full product offering. RX 1143. It shows the following Sirona product offerings:

- Apollo DI (as Arges' product came to be known) at $19,750 or $399 per month (a DI Product).

- CEREC AC Connect with Bluecam $25,995 or $526 per month (a DI product).

- CEREC AC Connect with Omnicam $449,995 or $1,012 per month (a DI product).

- CEREC AC with Bluecam plus CEREC MC $79,995 or $1,620 per month (a chairside product).

- CEREC AC with Omnicam plus CEREC MC $109,995 or $2,175 per month (a chairside product).

- CEREC AC with Omnicam plus CEREC MC X $129,995 or $2,570 per month(a chairside product).

5

At the time of the negotiations between the parties, Sirona only offered Bluecam as a DI product. The business plan that Sirona showed Claimants in January 2011 showed two products, Bluecam and the Arges product as Sirona's DI product offerings with Bluecam priced at $30,000 and Apollo at $20,000.

Sirona did not tell Claimants that it was working on developing and releasing Omnicam, a powder free DI product. While there was some lack of consistency in the testimony as to whether Respondents knew at the time of the negotiations that Omnicam would be offered as a DI only product or only together with a CEREC milling unit as a chairside product, the documents at the time evidence that at least some of Sirona's employees expected in the spring of 2011 that Omnicam would be offered as a DI only product.

Respondents had expected Apollo to be released in early 2012, however, because of the delays in the development of Apollo, Omnicam DI and Apollo were introduced to the market at the same time in 2013.

### c.  Arges' creation and plan

Dr. Gharib conceived of the idea of focusing three-dimensional images using a simple and inexpensive camera. After some exploration of different potential applications he decided to focus his efforts on the practical application of this idea in the dental scanner market. In consultation with Ms. Karpowitz, a manufacturer and distributor of CAD/CAM equipment, Dr. Gharib planned to develop an inexpensive scanner which would be sold to labs who would then either give the scanner to their customers for free or sell it at a low price in exchange for the dentist's agreement to send all milling work generated from digital scanners back to the lab that provided the unit. Arges would then get a percentage of the milling work sent to the lab for the life of the scanner.

 Arges believed that a marketing strategy with a very low initial cost for the dentist could penetrate a significant portion of the 90% of dentists not using any form of CAD/CAM. They planned to sell the Arges product for $6,000 or less. However, as a small startup with limited resources, the Arges team was hoping to develop the technology to a point where Arges would be acquired by a major market participant. The Arges product became known as Apollo when sold in the marketplace by Sirona.

### d.  The Parties' Negotiations

The parties began discussions about the possibility of Sirona acquiring technical know-how from Arges or acquiring Arges in 2009.  Stipulation ¶3. Arges delivered a presentation to Sirona on or about

6

November 2009 about its product and the parties had several discussions and meetings.  Arges and Sirona entered into a letter of intent ("LOI") for Sirona to acquire Arges. Stipulation ¶4. CX139. The letter of intent, dated November 5, 2010, was nonbinding but provided for exclusivity for a 60 day period and provided for a purchase price of $25 million payable in cash at closing and an additional purchase price of $25 million to be paid over five years upon the achievement of revenue milestones to be negotiated by the parties.

Sirona sought to extend the exclusivity. Claimants agreed to extend the exclusivity period on the condition that in January Sirona "review with us your business plan as it relates to the $25 million earn out." RX1023.  The parties stipulated that "Arges required that Sirona present a business plan for marketing and selling the Arges Product prior to the Merger Agreement. Arges conditioned the extension of the LOI exclusivity period on the receipt from Sirona of a business plan." Stipulation ¶¶5 –6.

Sirona agreed to discuss its business plan, stating:

> We are willing to discuss our business plans with you in January 2011. This may include to develop together a way to utilize the existing customer base of Kim Karpowitz optimally. We believe that there is a chance for Arges investors to reach 25 Mio ([Million] $ earn-out based on payments proportional to sales. Of course this depends on many variables, one major being the performance of the camera. It will also be important, how the digital impressioning market develops and what the strategies of competitors will be."

RX 1023.

On January 11, 2011, Sirona presented a business plan to Arges.  Stipulation ¶7.  CX 51. The business plan explained that Arges would be sold through the same distribution sales and distribution channels as Sirona's CEREC AC Connect, and that they were to be two basic pricing models, a flat $20K upfront price and $10K upfront payment plus payments in subsequent years. The business plan included a spreadsheet entitled "Numbers… Sirona Assumptions Arges first cut" showing an earn out to Arges of $25,105,000 through 2016 in the US only. The Agreement was later expanded to include 2017 and all global sales in the earn out. The document showed that Patterson, Sirona's U.S. distributor, "would provide installation, service, support, and training" and would sell to dental customers. Four avenues for sale were identified: Sirona top 50 labs, Karpowitz labs, midsize inlab labs, and CEREC specialists from Patterson. CX51.

### e.   Sirona's internal valuations of the earn out

Around the time that the business plan was presented to Arges, Sirona personnel prepared other projections of future sales of Arges. In sending the business plan around internally on January 11, 2011, the same day it was sent to Arges, it was noted that "it is important to understand that this business plan is

on the very optimistic side as it is used for negotiations with Arges. A base model still needs to be created." CX114.

On January 15, 2011, a Sirona email stated that the "most likely outcome" in the base case was a revenue earn out payment to Arges of $15-20 million. CX112.

A document entitled Project Laguna Board Presentation, dated February 2, 2011, reported that the earn out is capped at $25 million, "expected to be materially less (base case of approximately $10 million)." RX1021.

Sirona's 10-Q filing for the quarter ending June 30, 2011 reported that the fair value of the total consideration transferred for the acquisition totaled $31.1 million consisting of $20.9 million in cash and contingent consideration arrangements which provide for payments ranging from zero up to a total of $28 million. The fair value at acquisition date of these contingent payments was reported as $10.2 million. CX81 at 11.

Sirona did not disclose any doubts about the actual achievability of the $25 million earn out, and did not disclose that the business plan presentation it delivered in January of 2011 to Claimants was only one of many earn out scenarios or that it was an optimistic scenario. Neuharth Statement ¶ 9. If Arges had been told any of these things, they would have either rejected the transaction or restructured the deal. *Id.* at 13.

An email dated August 2012, written by Mr. Licata, stated that "the projections were likely, very rosy. They were essentially designed to add up to 25M." RX1158. Mr. Licata testified that he wrote that after the first year was delayed and he hadn't seen any movement toward the lab distribution model or any solution to the lack of incentives for the salespeople with the current distributorship. Licata Tr. at 733.

### f. The Merger Agreement

The parties entered into the Agreement executed on May 5, 2011, which governs the terms of Sirona's acquisition of Arges. Stipulation ¶¶ 12 – 13. Payment was made upon closing of $21 million with a small holdback which was later paid and is not in dispute. Section 3.04 of the Agreement dictates the terms of the Accuracy Earn Out and the Revenue Earn Out which are at issue in this arbitration. Stipulation ¶15.

Section 3.04(b) of the Agreement provided for a "Revenue Earn Out" based on revenues on sales of Arges up to a cap of $25 million.

Section 3.04(c) of the Agreement provided an additional $3 million "Accuracy Earn Out" if "Product Finalization" was achieved on or before the 18-month anniversary of the Closing Date. "Product Finalization" is to occur upon certification by Sirona that the Product complies with the

8

requirements for sale for the Product set forth in Exhibit 3.04 (c)(i). That exhibit entitled "Product Requirements" lists specific itemized system, handheld scanner, and computer and software requirements.

The Agreement further included provisions as to Sirona's obligations with respect to the Revenue Earn Out which are central to this dispute. Section 3.04(h) provides:

> From and after the Closing Date until the end of the Revenue Earn-Out Period, Parent shall cause the Business to be conducted in good faith and Parent shall exercise its commercially reasonable efforts to promote the interests of the Business to achieve realization of the Revenue Earn-Out; provided that Parent is not providing any assurance that the achievement of (i) the financial results or (ii) Product development that would result in the payment of an Earn-Out can or will occur. Notwithstanding anything to the contrary contained in this Agreement, no violation or breach of any agreement contained in this Agreement shall occur by reason of any decision by Parent or any of its Affiliates to … (v) take any other action which is consistent with prudent business practice.

Sirona agreed to add the good faith clause to the Agreement. Stipulation ¶10.

## V.  BREACHES OF THE AGREEMENT

### 1. THE ACCURACY EARN OUT

Claimants assert that "due to Sirona's unilateral actions, Claimants were denied the opportunity to perform formal accuracy testing, and were denied the fruits of their bargain." Claimants Post-Hrg. Br. at 35.

The factual issues that arise in the context of reviewing the Accuracy Earn Out require that the analysis be conducted both from the perspective of Product Finalization as required for payment of the Accuracy Earn Out pursuant to the Agreement and product finalization from the perspective of when the product was ready for sale. The first is relevant to whether or not Claimants are entitled to payment of the Accuracy Earn Out. The second is relevant to the analysis of damages as it pertains to when revenues could first have been generated.

As Mr. Licata summarized it: "Product finalization and a business decision to move forward with selling the product are two fundamentally different things. One has to do with the acquisition and the other has to do with… business decisions by management." Licata Tr. at 664; *Accord,* Pfeiffer Tr. at 902 ("That could be that we determine something as Product Finalization under this contract, which is not enough to justify – – for us to bring out the product responsibly. Yeah, that could be.")  The Tribunal

addresses each of Claimants' complaints about additional requirements imposed by Sirona that were not in their view required for Product Finalization from both perspectives.

It is important to note here that prior to the Agreement, Claimants "knew that Sirona wanted the Arges group to stay together" to develop the product. Licata Tr. 757 – 758. In addition, prior to the agreement, Claimants were told "that a software engineer was going to be coming" but not that any additional personnel would be added. *Id*. The Arges product was represented as being virtually ready for market. Thus it was contemplated during the negotiations that the Arges team would stay on and would be the ones to complete the development of the Apollo product. In fact, stock options and other incentives were provided to ensure employee retention and timely completion of the product development.  Arges understood before the closing that Sirona expected the Arges team to complete the project.

Sirona did send over Mr. Duchow from Germany, a very competent engineer, who performed most of the work needed on the tasks which Claimants complain were added inappropriately to the requirements for Product Finalization, including encryption and the interface with  AC Connect. While coordinating some of those efforts did require a little bit of the Arges employees' time, Mr. Duchow also performed some functions that were necessary for the development of the Arges product, including registration of the upper and lower jaw without which the product could not be put out in the market, and which the Arges' employees would have otherwise had to develop. Licata Tr. at 701-702.

### a.  Beta testing

Claimants assert that beta testing was an extra contractual requirement improperly added to the Product Finalization requirements. Exhibit 3.04(c) (i) to the Agreement which sets out the requirements for Product Finalization was heavily negotiated to specify the product requirements that would have to be achieved in order for Product Finalization to be certified and the Accuracy Earn Out payment made. It is undisputed that beta testing was included in early drafts of the exhibit and eliminated at Arges' request.

Sirona took the position that there were certain Product Finalization requirements, for example "the accuracy of the system shall be sufficient to create restorations with clinically acceptable fits", or "no fogging of the scanner optic shall occur when it is used according to the instructions for use" that could only be tested by beta testing. Pfeiffer Statement at ¶¶50, 87.

Mr. Licata explained at some length why in his view beta testing is not required for any of the Product Finalization requirements and that the Arges team had been very careful in the negotiations to make sure of that, because of their concern, that subjective factors could be introduced with beta testing which they could not control and which could delay payment. In his view, Arges purposely negotiated a

list of technical boxes that could easily be checked for the benefit of the employees who were to receive the Accuracy Earn Out. Licata Tr. at 780 – 783.

In light of the fact that beta testing was specifically negotiated out of the relevant exhibit to the Agreement which specified the Product Requirements, the Tribunal concludes that beta testing should not have been a requirement for certification of Product Finalization for purposes of payment of the Accuracy Earn Out.

The Tribunal further concludes that for purposes of when Apollo was ready for market, beta testing was essential. Prudent business practice required Sirona and Arges to perform testing of the Apollo system in humans to determine whether it would work before selling the system to dentists. Pfeiffer Statement ¶87.  Moreover, whether called "beta testing," "field testing," "clinical trials" or something else, the former owners of Arges told Sirona three months before the Agreement was signed and again two weeks after the Agreement was signed that Arges planned to conduct beta testing for the purpose of determining whether the system created acceptable dental restorations.  Pfeiffer Statement ¶86; RX1077; RX1078. As Dr. Pfeiffer said:  "You cannot go out with a medical device and not test it at all.  Pfeiffer Tr. at 901-902. Mr. Licata agreed that from a business perspective performing a beta test is reasonable. Licata Tr. at 641.[1]

The Tribunal concludes that Apollo could not be launched in the market and revenues generated until acceptable beta testing was completed. And indeed, beta testing was to Claimants' advantage – if the product put into the marketplace did not provide acceptable performance, it would have been "dead on arrival" and all prospect of revenue generation would be defeated.  Beta testing was commercially reasonable and conducted by Sirona in good faith.

**b. Knowledge transfer.**

Claimants contend that knowledge transfer was a time-consuming task which required Arges personnel to educate Mr. Duchow about the Arges product and software even though the Product Finalization requirements contain no knowledge transfer requirement and in fact did not deal at all with business concerns, only technical ones. Claimants' Post-Hrg. Br. at 44. Claimants contend that this diverted critical resources away from the development of the Arges product and delayed its reaching market and delayed the ability to test for the Accuracy Earn Out.  The Tribunal finds that knowledge

---

[1] Claimants also contend that the dentists used to conduct the beta testing were poor choices and led to inappropriate results. The evidence does not support this assertion. Rather, the evidence suggests that Sirona did its best exercising its best judgment to identify willing dentists who could best perform the beta testing on the Apollo product.

transfer was not one of the requirements listed on Exhibit 3.04 (c) (i), and accordingly was not a requirement for Product Finalization for purposes of the Accuracy Earnout.

However, the Tribunal concludes that knowledge transfer was required in good faith and was commercially reasonable. While the Arges team was incentivized to stay until the product was done, it was not clear what would happen once the product was finalized and whether they would pursue other opportunities. Pfeiffer Tr. at 892-893. It was necessary that the knowledge the Arges employees had be transferred to others at Sirona so that if there were problems that arose with the product they could be corrected and so further product development could be pursued. *Id.* Indeed, this too would be to Claimants' advantage, as any revenue stream would depend on the ability to correct problems and further develop the product to meet market demands.

### c.  Encryption

Claimants contend that encryption was not among the Product Finalization requirements listed in the schedule to the Agreement and yet the Arges team was required to encrypt the software, another task which delayed the development of the Arges product. Claimants' Post-Hrg. Br. at 40. As discussed above, Mr. Duchow was the one who took responsibility for the encryption but it did require some of the Arges personnel time to interface with him.

It is Sirona's policy to encrypt all of its software so that someone from the outside cannot take the software and re-create it. Pfeiffer Tr. at 880 – 881.  Mr. Licata confirmed that he did not believe encrypting the Apollo software was an unreasonable policy. Licata Tr. at 767.

The Tribunal finds that encryption was not one of the requirements for Product Finalization under the Agreement. The Tribunal further finds that requiring encryption was commercially reasonable and was required by Sirona in good faith. Again, while there was testimony that there were various ways in which the software could be hacked, the evidence suggested that protecting the software with encryption would serve to protect the Claimants revenue stream as it would help to prevent others from capturing the software in a manner which enabled them to use it to develop a competing product.

### d.  Integration with CEREC Connect

Claimants state that integration with Sirona's existing CEREC Connect software (which enabled dentists to send their digital impressions to the cooperating labs) was included in the initial draft of the Product Finalization requirements but was eliminated. Claimants' Post-Hrg,. Br. at 39. This required work by Mr. Duchow, who took principal responsibility for this task.   The textures were being continuously refined in connection with the development of Omnicam which caused updates that had to

be incorporated into the Arges project, and which did require some unquantified time by other Arges personnel.

The Tribunal finds that integration with CEREC Connect was not a requirement for Product Finalization. The Tribunal further concludes that requiring integration with CEREC Connect was commercially reasonable and required by Sirona in good faith. Competitors such as 3M and 3Shape operated with portals or similar setups. And while the digital file could simply be emailed to a lab, Mr. Licata agreed that there could be a convenience to be able to have the portal interface with the lab. Licata Tr. at 646 – 648. And again, it would seem that this would be of benefit to Claimants by making the Apollo product more attractive with its ease of connection to the labs.

### e.   Not switching to Gen 2 development in May 2011

Claimants argue that Sirona's refusal to allow the development of Gen 2 of Apollo in May 2011 frustrated their ability to achieve Product Finalization. Claimants' Pre-Hrg. Br. at 27.  No evidence was presented that the decision not to pursue Gen 2 in the first days after the parties entered into the Agreement was not a mutual decision. Mr. Licata testified that no one argued that the second generation should be pursued.  Licata Tr. 674. The undisputed testimony was that the decision to proceed with the first version of Apollo was a "joint decision at that point between Dave Licata and [Dr. Pfeiffer]." Pfeiffer Tr. 862.

Sirona wanted to reach a marketable product as quickly as possible as had been the agreed plan. Arges' budget and development overview delivered to Sirona in February 2011 included as an assumption that the commercial release of the current system (with software/calibration based accuracy improvements) would take place in September 2011. RX1078. In May 2011, Arges presented a manufacturing schedule that showed 100 scanners ready for commercialization in the fourth quarter of 2011. RX1077.

Developing the second generation starting in May 2011 would have delayed the launch of Apollo. Licata Tr. 719. And they could not do both in parallel and maintain the schedule. Licata Tr. 723. Claimants' internal document in January of 2011 confirmed that development of the second generation was expected to delay commercial release, cost more, and would not make "business sense." RX1080. Claimants did not tell Sirona that working on the second generation would get Apollo to market cheaper or faster or that Gen 1 would not work.  Licata Tr. 741-743.  Sirona's pursuit of the development of the first generation was driven by a desire "to reach a marketable product as soon as possible and as planned in the … original business plan."  Pfeiffer Tr. at 864.

Claimants ignore the delay that would have occurred from changing design. As Mr. Licata testified, the move to the second generation required almost all new hardware and software.  Licata Tr. 727-728 ("the outer shell is the same.… But the completely new set of parts is the sensor, aperture, plate that makes the apertures, and then the prisms instead of filters.  So that's a pretty fundamentally different way of the architecture of the system.… [and] Arges couldn't use the existing software from first generation.").  The parties agreed that Sirona would spend about $2 million to complete the development of the Arges product. Licata  Tr. 744-745.  Claimants' internal documents show that parallel development would have cost more.  RX1080.("I'm not sure 2 million will cover it … 2.5 million minimum, and if we hit any delays that could go to 3 million").

Sirona and Claimants both expected that the first commercialization of Apollo would use the hardware design presented by Arges before the Agreement.  RX1023 ("The hardware design for first to market product is frozen"). The decision not to move to Gen 2 in May of 2011 was consistent with Arges' presentation to Sirona in February 2011, which states: "next-generation release – no resources until after commercial release;" "no software development will be done to support next-generation handpiece until after commercial release of current system." RX1078. Dr. Gharib confirmed precisely this plan in his witness statement: "my understanding of the deal between Arges and Sirona is that a version of the Arges scanning system that would meet (but not necessarily exceed) dentists' needs was supposed to go to market quickly. Once that product was on the market, an upgraded version in line with Sirona's reputation as the market leader in digital impression would be developed and subsequently released." Gharib Statement. ¶11.

No evidence was presented that the decision to develop the first generation as quickly as possible and not to switch to the development of Gen 2 in May 2011 was not a good faith, commercially reasonable decision made by Sirona jointly with the Arges personnel.

### f.   Problems with the Apollo development

Upon the completion of the acquisition there was pressure to get the product finalized as quickly as possible. But they were a series of delays and problems encountered in the development of Apollo, leading up to the final decision in late June of 2012 to switch to the development of Gen 2.

While earlier plans had contemplated going to market as early as September 2011, the date was continually deferred. An updated project plan as of October 15, 2011 identified March 2012 as the date on which the product would be available for sale. RX1082. At that point the holdup was FDA registration. Then there were delays with margin marking. In November 2011, Arges experienced delays in integrating the new hand-piece with a new computer and new software. RX1111. Scanning issues relating to the

angle of the prism used to capture the video image were identified.  In December 2011 the software could not catch up correlating the video stream. The unit had difficulty capturing distal/proximal areas. It appeared the angle of the prism needed to be changed. RX1087. The camera and the PC failed the electromagnetic interference test, preventing the start of beta testing.  In January, Arges decided to implement the prism change.

In January 2012, Mr. Licata still did not "have compliant computers to do the safety testing that needs to be done to be allowed to" start the beta test.  As a result of the need to acquire compliant computers, the beta test and further product development was delayed.  When the beta testing was finally done in May 2012 there were problems with margin marking and filling, the  cameras sometimes fogged, margins were blurred, labs refused to manufacture restorations because the images were of insufficient quality, and the majority of restorations did not fit. RX1087. The decision was made in June 2012 to move on to developing Gen 2 and as Mr. Licata then forcasted, Apollo was ready in March of 2013 for market. Pfeiffer Statement ¶¶ 74 – 102 and exhibits cited therein.

The Tribunal concludes that the delays in the introduction of Apollo to the market until the spring of 2013 was due to no fault of Sirona's, but rather to the difficulties encountered by the Arges personnel with developing the product and correcting technical deficiencies so that it could be ready for sale. As Mr. Licata conceded, he "did not think [they] did a very good job of predicting how long it would take to get to the market prior to the acquisition." Licata Tr. at 774. Nor was Sirona able to make a more accurate forecast. *Id.*

### g.  Sirona's support of Apollo

Claimants contend that Sirona failed to provide adequate resources and support for Arges. Claimants' Post-Hrg.Br. at 45. As discussed above, Arges had represented that it could commercialize its product within a matter of just a few months after the acquisition. They knew that Sirona expected the Arges team to complete the development.

After the acquisition with the additional hires that were authorized, Arges had seven engineers not including Mr. Duchow from Germany, four regulatory consultants and the ability to add 3 to 6 engineers from its third-party software engineering firm at any given time. Licata Tr. 591 – 596. While there were limitations to hiring permanent staff, Mr. Licata could add hours to existing consultants and "never got pushback on our regulatory consultants or things like that when we were having trouble and needed more help. So consulting was a lot easier." Licata Tr. 758 – 759. Sirona also offered assistance from its Bensheim Germany facility with regulatory matters outside the United States and connections

through the portal. It also took over the manufacture of the cart in order to relieve the Arges staff of that responsibility and time commitment for that task.[2]

In November 2011, as it became apparent that the development was running into snags and would be delayed, Dr. Pfeiffer wrote to Mr. Licata, stating "I believe that we need to find a way to add more resources to the project and this in a way which does not slow you down in the immediate future, but just is of help to secure the promised dates." RX1086. Mr. Licata's requests in response to this invitation were all addressed by Sirona and accommodated to a large extent.

In connection with the acquisition the parties had agreed on an expectation that it would require $2 million to complete the development of the Arges project, $1 million contributed by Claimants with a reduction in the purchase price and $1 million to be contributed by Sirona in the operations. There is no suggestion and no evidence that would suggest that $2 million was not spent by Sirona on the development of the Arges product during the initial development months. That there were budgetary constraints and limitations in the hiring of additional full time staff does not suggest bad faith or a failure to exercise commercially reasonable efforts. Indeed, as Mr. Licata testified in the course of his work with Sirona, he never believed that Sirona was "trying to tank Apollo or trying not to sell Apollo." Licata Tr. at 776.

The Tribunal finds that Sirona's support of the technical development of Apollo was commercially reasonable and in good faith.

### h. Frasaco Model

Claimants contend that possibly the greatest source of delay resulted from the fact that the Frasaco model specified by Sirona for the accuracy testing was not dimensionally stable. Claimants' Post-Hrg.Br. at 36. Mr. Harvard spent time over the course of a year as part of his work on the project trying to determine the source of the error and ultimately concluded that the models had deformed due to thermal expansion or moisture absorption. Gharib Statement at ¶¶ 46 – 47.

### i. Entitlement to the accuracy earn out

It is undisputed that no formal accuracy testing was ever performed because Product Finalization was not certified by Sirona until March 2013, after expiration of the 18 month period during which the Accuracy Earn Out could have been achieved. However, Mr. Harvard performed an informal subset of the

---

[2] The cart selected by Sirona did not meet certain regulatory requirements in the United States and, while usable, required some modifications in the dentist's office.

test described in the Accuracy Earn Out portion of the Agreement and the results were better than required to entitle the Arges shareholders to the full $3 million. Gharib Statement ¶48, CX168.

The Tribunal finds that Product Finalization as defined in the Agreement only required performance of the requirements set forth in the Agreement and that was not the same as what may have been required for Product Finalization for purposes of going to market. In light of the fact that (a) certification of Product Finalization was delayed by Sirona as it awaited completion of requirements for Product Finalization for going to market, (b) Arges was deprived of the opportunity to test and see if the accuracy earn out criteria were met, and (c) Mr. Harvard had conducted a test before the deadline which, albeit not complete and unofficial, demonstrated that the Arges product met the standard of accuracy set forth in the Agreement, the Tribunal finds that Claimants are entitled to the Accuracy Earn Out in the amount of $3 million.

## 2. THE REVENUE EARN OUT

Claimants assert that Sirona took actions or failed to take actions that significantly impeded Arges' ability to achieve the full revenue earn out. They highlight in particular problems with distribution, pricing and the release of Omnicam. Claimants' Pre-Hrg. Br. at 38 – 49, 57.

As noted above, the Agreement specified the standard to which Sirona was to be held in its handling of the Arges product:

> [Sirona] shall cause the business to be conducted in good faith and [Sirona] shall exercise its commercially reasonable efforts to promote the interest of the business to realize to achieve realization of the Revenue Earn-Out... Notwithstanding anything to the contrary contained in this Agreement, no violation or breach of any agreement contained in this Agreement shall occur by reason of any decision by [Sirona] or any of its affiliates to…  (v) take any other action which is consistent with prudent business practice.

### a.   Good Faith

Respondents take the position that where there is an express contractual duty of good faith, the plaintiff would have to "typically show that the party acted in subjective bad faith." e*v3, Inc. v. Lesh*, 103 A.3d 179, 191 (Del. Supreme Ct. 2014).  Claimants state that a "conscious disregard" for known duties— which is noted as a lower standard—also demonstrates bad faith under Delaware law.  *Chen v. Howard-Anderson*, 87 A. 3d 648, 683 (Del Ch. 2014).

17

**b. Commercially reasonable efforts**

The cases uniformly hold that whether defendant's actions are "commercially reasonable or not, is a question for the trier of fact and must be determined on a case-by-case basis." *Edgewater Growth Capital Partners L.P. v. H.I.G. Capital Inc.,* 68 A.3d 197210 (Del. Ch. 2013), cited in *Diversified Indus. Minerals, L.L.C. v ADA Carbon Solutions*, 2013 WL 3930089 *7 (E.D. La. July 29, 2013).

The parties appear to be in agreement that in assessing whether conduct was commercially reasonable it must be viewed in the context of "prevailing trade practice among reputable and responsible business and commercial enterprises engaged in the same or similar businesses." Claimants' Post Hrg. Br. At 75 – 76. Respondents' Post Hrg. Br. at 1-3. Citing *Diversified Indus. Minerals, L.L.C.*, 2013 WL 3930089 *7 (E.D. La. July 29, 2013); T*om- Lin Enters v Sunoco, Inc.* 349 F.3d 277, 283 (6th Cir. 2003). Respondents contend that that no such evidence was offered and that failing such evidence, Claimants must be denied recovery. The Tribunal however looks to Sirona's own actions and internal discussions of possible approaches as evidence of prevailing trade practice in this business and an appropriate basis for comparison.

There does not appear to be a uniform definition in the case law, of "commercially reasonable efforts," an undefined term in the Agreement. Most of the cases cited by the parties conduct an analysis of whether or not the challenged conduct was reasonable, but do not define the term.  One case cited by Respondents does undertake the task and states that it means to "make every effort to obtain the [promised result] that a reasonable business entity would have made under similar circumstances."  *See Castle Props. v. Lowe's Home Ctrs.*, No. 98 CA 185, 2000 Ohio App. LEXIS 1229, at *15 (Ohio Ct. App., Mahoning County Mar. 20, 2000).

In a footnote, Respondents cite to *MBIA Ins. Corp. v. Patriarch  Partners VIII LLC*, 950 F. Supp. 2d 568, 618 (S.D.N.Y. 2013) for the proposition that "A contractual requirement to act in a commercially reasonable manner does not require a party to act against its own business interests, 'which it has a legal privilege to protect'" quoting *Citri-Lite Co. v. Cott Beverages, Inc.*, 721 F. Supp. 2d 912, 924 (E.D. Cal. 2010). In *MBIA*, the challenged conduct was not only important to prevent damage to defendant, but also to prevent damage to the plaintiff, thus the business interests were aligned and the case does not stand for the proposition that the conduct was permissible because it protected defendant's interest even though it was to the detriment of the plaintiff.

 In *Citri-Lite Co.*, the court reviewed the various definitions courts have offered including, *inter alia,* one California court's definition of the UCC's commercially reasonable standard as "commonly

accepted commercial practices of responsible businesses which afford all parties fair treatment;" one Minnesota court statement that "whether or not [defendant] performed with commercial reasonableness also depends on the financial resources, business expertise, and practices of [defendant]. (Internal citations omitted). The Citri-Lite court declined to grant summary judgment even though the defendant "rationally" defended its marketing decisions stating that there was a triable issue and defendant's economic business interests were "a factor that can be considered when determining whether defendant engaged in commercially reasonable efforts to promote and sell [the product] as required by the agreement." *Id* at 928.

As Respondents urge, the analysis must be conducted without reliance on hindsight and cannot be based on an argument that if things had been done "differently that would have produced a better result." *Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, No. 03 Civ. 8259, 2007 WL 1988150 at *24 (S.D.N.Y. July 9, 2007).

The Tribunal is guided by these authorities in its discussion.

### c.   Prudent Business Practice

In their post hearing brief, Respondents contend that the phrase "[n]otwithstanding anything to the contrary" is 'unambiguous' and 'take[s] precedence over' and thus negates any contrary provision" in the Agreement, citing *In re Gulf Oil Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 730 (S.D.N.Y. 1989); *Symbol Technologies, Inc. v. Voicenet (Aust.) Ltd.*, No. CV-03-6010 (SJF)(ARL), 2008 WL 89626, at *2 (E.D.N.Y. Jan. 4. 2008).  Respondents' Post-Hrg. Br. at 4.

Respondents then contend that "because the "prudent business practice" clause, the final phrase in section 3.04(h) of the Agreement ,"takes precedence over" and "negates any contrary provision," not only do Claimants have to show that an act or failure to act actually breached a term of the Agreement, Claimants must also prove that any purported breach was not consistent with prudent business practice. *Id.* The Respondents devote much of their briefing to support Sirona's actions as prudent.

Claimants state that the "prudent business practice" language does not provide a "get out of jail free card." Claimants' Post-Hrg. Br. at 11. It does not permit Sirona to make any and all decisions "regardless of whether they were in line with their obligation to make commercially reasonable efforts to achieve the REO [revenue earn out]." *Id.* at 12.  Claimants contend that the "prudency exception must be read as only offering protection to Respondents where their actions otherwise were undertaken in good faith to achieve the Revenue Earn Out." *Id.* at 10. The Tribunal concurs. "All parts of the contract must be read in harmony to determine the contract's meaning, with one portion of a contract not being read to

19

negate a different portion." *Honeywell Intern. Inc. v. Air Products & Chemicals, Inc.*, 872 A.2d 944, 956 (Del Supreme Ct.. 2005). Such a harmonized reading is possible here.

As Claimants state, the good faith clause imposes an obligation to achieve the Revenue Earn Out; the prudent business practice clause constitutes an exception. Thus, it requires Respondents to (1) determine what course of action would most likely achieve the revenue earn out; then (2) whether such course of action is commercially reasonable in the context of the Arges business (and not exclusively the Sirona business); and, if so, (3) whether such course of action would be inconsistent with prudent business practice.

So while "commercially reasonable efforts," as discussed above, may allow for some consideration to be given to Sirona's economic self-interest in the context of that analysis, the prudent business practice language does not relieve Respondents of responsibility to pursue commercially reasonable steps to achieve the revenue earn out.  Read as a whole, the language of the Agreement compels the conclusion that it is an examination of the business practice in question in the context of the industry as a whole, and not from Sirona's individual profit maximizing perspective, that must be assessed to see if it is consistent with prudent business practice.

With these principles in mind, the Tribunal reviews Claimants' specific allegations.

### d.  Sirona's Distribution

Claimants assert that Sirona breached Section 3.04 (h) by using Patterson as its distributor for Apollo in the United States. Claimants' Pre-Hrg. Br. at 44-47. The United States was expected to be the most significant market for the sale of Apollo units. Sirona had an arrangement with Patterson pursuant to which Patterson was its exclusive distributor in the United States.

Sirona recognized even before the merger was consummated that Patterson's employees were not motivated to sell DI products "due to strong [financial] incentives for selling chairside milling" CX49. And Patterson did not "provide adequate support to the installation and training" for Sirona's existing CEREC Connect product and "training for DI was not a priority." *Id.* To address this concern, Sirona planned to have 75-85% of the sales accomplished through its own sales team making direct sales to dental labs, a plan consistent with the Arges employees' original marketing plan to focus on labs. This was a plan which Sirona expected would be successful. RX1156.

Sirona hired a digital impression sales team and a digital impression national sales manager and organized events with dental labs to educate dentists about digital impression. Sirona planned and organized over 40 events with over 750 labs in attendance in 2012. It had been anticipated that Apollo would be ready in time to be shown at these events. However, because of the delays in Apollo's

development, the events were conducted selling only Bluecam. Notwithstanding these multiple events, Sirona was not successful in selling a single Bluecam DI unit.

Concerned that they would lose their employees who worked on commission, Sirona renamed the clinical CAD/CAM sales team and had them working at selling all CAD/CAM products to dentists. They received a sales promotion incentive of $500 for each DI product they sold, but not for any other CAD/CAM unit. Sirona's in lab sales team, which sold only Sirona products and did not sell the more expensive CEREC chair side systems, also worked on selling Apollo to labs. Starting in May 2013, Sirona conducted a series of in lab summits throughout 2013 and 2014 to educate lab professionals and to have them obtain training on Apollo and witness demonstrations. Augins Statement ¶¶49-56. But the plan to sell through labs was not successful and sales of DI including Apollo were weak. The market for DI did not develop as expected for Sirona or for others in the market.

The situation was exacerbated by the fact that support for the Apollo units was lacking and sales to dentists, which were still supposed to account for 15 to 25%, of the market, were not pursued. Sirona's distribution strategy left servicing and training in Patterson's hands as Sirona's exclusive distribution partner in the United States working with dentists. Ample evidence was introduced that after the Apollo launch Patterson was simply not interested in providing service on Apollo units or training dentists in its use and refused to do so. Indeed, evidence was introduced showing that Patterson declined even to follow up on specific inquiries and leads for the sale of Apollo units. *See e.g.* CX39, CX44, CX41, CX45, CX182. Notwithstanding the continued reports of Patterson's inadequacies in assisting in marketing Apollo, Sirona took no steps to investigate alternative mechanisms for delivering the necessary distribution support for Apollo.

A review of the DI market in May 2014 prepared by Sirona's Mr. Kucharczyk sums up Sirona's approach. CX66.  The review recognizes that sales of DI (including all three of Sirona's DI products) are low and analyzes the reasons for such low sales. It considers three factors: distribution, pricing and technology. With respect to distribution it notes that Sirona "is focused on CEREC chair side systems which bring a major part of the revenues for Sirona." "Dealers are focused on CEREC chair side systems… "complete systems are easier to sell and bring higher bonus to local salespeople"… "Sirona sales via the lab channels did not bring the expected numbers"…"A new OEM business for DI would most likely cannibalize CEREC business." "Sirona must continue the CEREC skimming strategy due to gross profit." "We will not defocus our distribution with DI hardware sales." After reviewing the competition's lack of success it concludes "there is no high pressure from competition that could lead to change the CEREC centered sales strategy." "Since we can't afford sacrificing CEREC margin, so we

will continue the skimming strategy." "No high pressure from competition that would force us to change." *Id.*

Sirona did not change its distribution to move away from Patterson for Apollo. While it is recognized that there was an exclusive contract with Patterson, given Patterson's lack of interest in Apollo, at the very least a robust conversation could have been had to see if the situation could be remedied and alternatives adopted. Sirona could have explored alternatives to its distribution such as the OEM approach referenced by Mr. Kucharczyk in May 2014 and which he is now pursuing for DI. Ex 11 at 67-68. [3]

Taking measures to implement distribution channels more likely to generate increased sales when it was recognized that the existing distribution channels were not working or at the very least seriously exploring alternatives would have been commercially reasonable. Changes in distribution are consistent with prevailing trade practice as Sirona itself is now considering and changing distribution is a common prudent business practice.

No evidence was introduced of any efforts on the part of Sirona to improve the distribution of Apollo in the face of the failure of the lab distribution channel and the utter failure of Patterson to support Apollo sales, servicing or training. The Tribunal concludes that in fulfillment of its obligations under the Agreement, such actions by Sirona were required. Accordingly, the Tribunal concludes that Sirona breached its obligations under section 3.04(h) of the Agreement.

### e.   Pricing of Apollo

Claimants assert that Sirona breached Section 3.04(h) when it failed to price Apollo in a manner consistent with maximizing its salability and revenue generation. Claimants' Pre-Hrg. Br. at 61.

 Survey research commissioned by Sirona in October 2012 found that the optimal price for Apollo was $11,000. CX75. Feedback from dental labs stated that $7,500 was an ideal price, but "everyone is in agreement that more than $10,000 is the breaking point." CX108. Information received from one of Sirona's beta testers stated that a $10,000 price point would be okay but that $15,000 was too high. CX1265. While pricing at $13,000 was considered at Sirona, CX208, Apollo, which was intended to be the low-priced entry in the Sirona product offerings, was priced by Sirona at $20,000.

---

[3] Sirona is developing the next version of Apollo but there is no assurance that it will be on the market in time to generate any revenue earn outs for Claimants. Pfeiffer Tr. at 913-915.

The cost associated with the component manufacturing parts and their assembly for Apollo was between approximately $5,000 and $7,000 for the total product. Ulmer Tr.1328; Licata Tr. at 2430-2434; Augins Tr. at 1538.  While there was some testimony that the total variable cost for Apollo was $14,000 per unit on top of which Sirona was obligated to pay 33% to Patterson leading to a $20,000 price, there is no documentary evidence in the record to support this assertion as to the cost that one would expect to find making it difficult to credit that testimony.

Nor is there any evidence that the price for Apollo was determined based on an analysis of the price at which sales could be maximized in the context of costs incurred in connection with Apollo. Certainly Sirona's own costs, at least the variable ones, could appropriately have been considered in setting the price, as the case law does suggests that Sirona's own economic interest could be one factor to be considered in the decision as to what is commercially reasonable. But cost was not the basis for the decision. On the contrary, the $20,000 price was set based on "what would maximize our [Sirona's] profitability, what would the markets accept, what did customers say was their preferred pricing model." Augins Tr. at 1462 – 1463. Thus Apollo was priced at $20,000 just a little bit below the competition's pricing. While price promotions were offered on Omnicam, and perhaps on Bluecam as well (the testimony conflicts), no price promotions were ever offered on Apollo with the exception of the single one-off reduction offered in connection with the American Dental Practices "bake-off" discussed below.

One of Sirona's objectives from the start was to "protect against a threat" to the Sirona business with the introduction of a low-cost scanner into the market which might bring Sirona's CEREC prices "under pressure." CX23. That strategy governed Sirona's conduct throughout. The same review of the DI market prepared in May 2014 by Sirona's Mr. Kucharczyk discussed above reviews whether pricing would boost the low sales of DI. CX66.  With respect to Apollo it concludes that as a powder system "Apollo DI must be priced significantly below the powder free systems." But "Sirona's profits are largely driven by CEREC chair side systems" on which Sirona enjoys an extremely high profit margin. The review recognizes that "decreasing the price tremendously to increase sales would mean to cannibalize CEREC business as well as Sirona gross profit" The review recognizes that "as long as we are skimming CEREC we will fail in selling DI hardware standalone." *Id.* at 12-13. Sirona did not reduce the price of Apollo. In fact two small price increases were put into effect on Apollo after the launch.

Sirona points out that Claimants were informed prior to the merger that Sirona would price Apollo at $20,000. In an email to Claimants dated December 22, 2010, Sirona stated, "We plan to sell the system at around 20K$. We prefer not to enter into per case fees." CX1239. Sirona further points out that the van Westendorf analysis upon which Claimants rely for their recommendation of a price of $11,000 also stated that "more respondents preferred the option to pay $20,000 in full with no further annual

23

licensing fee." It also stated that "50% ranked 'pay upfront 20,000 with no further fees' as their most preferred payment plan." CX75.[4] That Sirona told Claimants about the $20,000 price does not relieve Sirona of the obligation to continually assess and reassess how they could satisfy their obligations under the Agreement. Lowering prices is a commercially reasonable avenue for increasing sales and is a common prudent business practice.

Sirona contends that lowering the price of Apollo would not have increased sales. For example, Sirona states that between June 2013 and April 2015, it sold only 63 units of Apollo DI in the United States. During the same time it sold 4,500 CEREC AC with Omnicam systems. These are the chair side systems which were at least $90,000 more expensive than the Apollo systems. During the same time period Sirona sold only 265 AC Connect with Omnicam systems even though they were priced at $60-$70,000 less than the CEREC AC with Omnicam. Sirona explains this difference by explaining the differences in the value proposition offered to the dentist. The chair side units offer single visit dentistry to patients and the dentist can capture the profit that a lab receives for manufacturing the crown with individual impressions. A lab saves money on DI but there is not a powerful enough value proposition to show the dentist to easily prove that the dentist will save money or time by using a digital system or to easily prove that the patient experience will be meaningfully better. Augins Statement at ¶86.

The Tribunal finds that taking measures to reduce pricing to generate increased sales when it was recognized that the existing pricing was not working or at the very least seriously exploring alternatives pricing structures would have been commercially reasonable. Changes in pricing are consistent with prevailing trade practice as Sirona itself often discounted Omnicam and reducing prices is a common prudent business practice.

No evidence was introduced of any efforts on the part of Sirona to address Apollo's weak sales with price reductions or even an analysis of the impact that a price reduction would have on Apollo sales. The Tribunal concludes that in fulfillment of its obligations under the Agreement, such actions by Sirona were required. Accordingly, the Tribunal finds that Sirona breached its obligations under section 3.04(h) of the Agreement.

---

[4] In the presentation given to Claimants in January of 2011 Sirona suggested two pricing models would be used: $20,000 and an Arges license at $10K + $3k per year in years 2-x. CX51. The second option was dropped before the product was introduced into the market. Given the fact that these two pricing models are the same in terms of the total economic impact and the fact that the survey did show that the most popular response was an upfront payment of $20,000, the Tribunal does not find this troubling.

### f.   Introduction of Omnicam

Claimants assert that Arges's ability to achieve the full revenue earn out was impeded by Sirona's launch of Omnicam in 2013, a product about which they were never told before the merger. Claimants' Pre-Hrg. Br. at 43. Claimants contend that Omnicam always took priority over the Arges product when resources were allocated and while originally priced at $50,000, price promotions on Omnicam, which was a powder free product, brought it down to the low 30s bringing it very close to the Apollo price and making the Apollo pricing at $20,000 even less appropriate if achieving sales was an objective.

Respondents assert in response that they made no commitment not to bring out additional products, that Claimants always knew they were continuing to do research in the CAD/CAM market, and that they had success with market segmentation in other parts of their product line with products at various price points, and in some of those cases the lowest price product was the most successful.

The Tribunal is less persuaded of Claimants' position on this issue. Claimants did know that Sirona was continuing to do research. Everybody in the field knew that there was interest in powder free DI. That Sirona in fact was continuing to do such research should not have come as a surprise. Moreover, it is not clear that Omnicam's introduction really impacted the market for Apollo. There were several other powder free DI products introduced into the market in 2013 by other substantial competitors which offered similar powder free competitive options, and in fact at Apollo's lower price point. And, as discussed above, it is the Tribunal's conclusion that the support given by Sirona to the Arges team during the development of Apollo was not deficient and was consistent with what had been planned in the negotiation of the merger. Accordingly, the Tribunal finds that resources were not diverted to Omnicam from Arges as Claimants contend.

### g.   Marketing and training

Claimants also contend that Sirona's marketing efforts were inadequate and that Sirona failed to provide the training necessary to enable users to use Apollo effectively.

As one of their main points, Claimants emphasize the 27.5 event that Sirona hosted for CEREC chair side. This event was a multimillion dollar extravaganza in Las Vegas attended by wealthy dentists who for the most part already owned the expensive CEREC chairside system. Sirona incurred no expenses in connection with the event as all the participants paid thousands of dollars to attend. Claimants' suggestion that something similar for Apollo would have been appropriate or possible is not supported by the evidence. Apollo was a low-end product intended to attract dentists who were not willing or able to spend large sums on dental equipment. There was no evidence offered that would lead

25

one to believe that an event like 27.5 would have been possible or successful for the dentists or labs that Apollo sought to attract.

Claimants presented dramatic videos from the Las Vegas event, and showed by comparison an individual sitting at an Apollo unit at the launch at the international dental show, the largest annual dental show in the world, in 2013. Claimants failed to show that what was being done by that individual sitting at the single unit was displayed on a huge 12 foot big screen to attract those attending this largest annual international dental show. One could conclude that that was actually a better marketing technique for Apollo.

Sirona prepared various marketing materials in their efforts to promote Apollo including developing the CAD/CAM for Everybody brochure which had Sirona's entire line of CAD/CAM products so dentists could pick the level at which they were comfortable. Other brochures were prepared and many other events were hosted in the months following the launch of Apollo.

With respect to training, various documents were introduced which suggested that the training for Apollo was insufficient and that Apollo is a product that requires special handling and must be manipulated the right way to get good results. See e.g. CX 101. It would appear that greater attention to how to deliver better training for Apollo would have been beneficial. The evidence was insufficient to make a determination as to whether there were ways in which better training could have been delivered internationally in a commercially reasonable manner. Sirona does not have its own personnel to attend to those kinds of issues all over the world, but rather depends on its local distributors and on web-based solutions.

However, in the United States, as critical market for Sirona, Patterson was responsible for the training, as discussed above, Patterson was not interested in delivering training for Apollo. The Tribunal has found that a change in the distribution in the U.S., or at the very least a serious study of other options, would have been commercially reasonable and required for compliance with section 3.04 (h) of the Agreement. A change in distribution would have led to improved training, at least in the United States.

### h.  Sirona's objectives for the Arges acquisition

Claimants emphasize Sirona's acquisition of Arges for defensive purposes in support of their contention that Respondents did not make commercially reasonable efforts. Claimants contend that Sirona's principal objective was defensive as opposed to one calculated to maximize sales of Apollo. CX

23. And there is support in later documents for the contention that the acquisition was sought chiefly for defensive purposes as Sirona employees sought to defend their championing of the acquisition. CX146.

It is clear that one of the reasons Sirona decided to acquire Arges was for defensive reasons. And prior to the merger, Sirona internally discussed the defensive value of acquiring Arges. Stipulation ¶11. Indeed, Claimants themselves understood that long before the acquisition, as Mr. Bergheim confirmed, he was told that by Mr. Pfeiffer.  Bergheim Tr. at 283 – 284. Recognition of this fact is reflected in Claimants' own marketing document which presented as a selling point Sirona's vulnerability to "any disruption in the market that would threaten sales or decrease margins. RX1226.

The presentation delivered to Sirona's board in February 2011 summed up Sirona's objectives in acquiring Arges as they were understood and planned at the time. Three objectives were explained to the board in seeking approval for the acquisition:

- Accelerate penetration of DI sales, which is vital to achieve our goal of leadership in this rapidly growing and strategically important market.
- Complement our product portfolio by a low-cost DI product.
- Secure our technology portfolio with the lowest-cost position and keep it away from competition.

RX 1021.

The Tribunal finds that this presentation accurately reflected Sirona's objectives in entering into the acquisition of Arges. The defensive strategy was surely one of the reasons but Sirona also wanted to enter the market with a low-cost product and intended to market Apollo successfully. The defensive value had decreased at the time of the international dental show, the largest global dental show in the world, in 2011, before the agreement was signed, as Dr. Pfeiffer wrote at the time. RX1133.  But he continued to advocate for the acquisition as there were other strong motivating factors as well.

That Sirona expected to make the efforts to succeed with Apollo is demonstrated in the presentation to the Sirona board, which predicted a base case (which generally means the lowest expected) sales of Apollo of approximately $100 million in the U.S. alone through 2016.  RX1021.  Mr. Augins expected the earn out to be $15-$20 million which would have meant $150-$200 million in sales, CX112, a sales result which anticipated and required a significant sales effort by Sirona and demonstrated a sincere interest in promoting Apollo and making it a success.

### i.   Breach of Section 3.04(h) of the Agreement

The Tribunal concludes based on a review of all of the evidence that Sirona fully intended to develop and sell Apollo. Sirona took steps to overcome the anticipated problems with relying on

Patterson's distribution and established a sales mechanism that relied principally on direct sales to labs, a sales strategy consistent with the one Claimants had developed and urged.  And Sirona expected that strategy to be a success as is reflected in the later Sirona documents which refer to the labs not having worked out "as expected." Indeed, the Tribunal recognizes that Sirona's efforts could not have been as deficient as Claimants suggest since Sirona captured 21% of the DI market as described in an independent market report issued in 2014, a greater share than any other company. CX105. Sirona's DI sales in 2013 were almost entirely sales of Apollo.[5]

Sirona expected Omnicam to be released at least a year after Apollo was introduced and established in the market and it was only the delays in the development of the Arges product that resulted in the two products being introduced simultaneously in March 2013. As originally priced, Omnicam was going to cost tens of thousands of dollars more than Apollo and was not viewed as a direct competitor. Claimants had no right to assume that Sirona was frozen in terms of its product offerings. No promises were made and Claimants knew well that Sirona was going to continue to maintain its role as the leader in CAM/CAD by developing new products. And pricing just below the competition as the least costly entrant in the market could have in good faith been considered to be a commercially reasonable way to enter the market with Apollo.

However, while perhaps initial intentions and plans were made in good faith in a commercially reasonable fashion, as events developed, Sirona failed to make the adjustments that were required to fulfill its contractual obligations. Sales were extraordinarily weak at the price point at which Apollo was offered. Patterson, although not principally responsible for sales, was still responsible for training and servicing and proved not to be interested in fulfilling that important task or for making even the sales expected of it. As reflected in Sirona's own market review, if increasing sales was the objective for DI products, including Apollo, prices would have to be significantly reduced and the distribution system changed. CX66. Sirona did not undertake either of those corrections.

The Tribunal finds that just months after Apollo was launched in 2013, Sirona essentially gave up on it in it and made no efforts to increase sales by taking any of the various commercially reasonable steps that it recognized were available to it to achieve increased sales and so increase the revenue earn out

---

[5]  In 2013 Sirona sold 454 Apollo units and only 92 Omnicam units. The next most successful manufacturer of DI products, 3M, sold 468 units, only 12 more units than Apollo. Respondents Demo Ex. 1 –2; Erdem Tr. 1689 – 1695. Omnicam DI only began to succeed in the market later because it became applicable to orthodontic uses.

including distribution changes and price reductions. As discussed above, in light of its obligations under the Agreement, it was required to do so.[6]

The Tribunal concludes that Sirona breached its obligations under section 3.04 (h) of the Agreement by failing to conduct the business in good faith and to exercise its commercially reasonable efforts to promote the interests of the business to achieve realization of the Revenue Earn Out, actions which would have been consistent with prudent business practice.


## 3. COVENANT OF GOOD FAITH AND FAIR DEALING

As Claimants recognize, the implied covenant of good faith and fair dealing only applies where the contract lacks language governing an issue. Where the contract specifies a certain level of care, the implied covenant is not applicable. The implied covenant cannot be used to create "a free-floating duty unattached to the underlying legal documents." *Fortis Advisors LLC v Dialogue Semiconductor PLC,* 2015 WL 401371*3 (Del. Ch. January 30, 2015). Claimants' Pre-Hrg Br. at 62. In *Fortis*, which also concerned the seller of a business suing over an unachieved earn out, the court held the contract language, which required the purchaser to use "commercially reasonable best efforts to… achieve and pay the earn out payments in full" was the standard by which to evaluate defendant's conduct and not the implied covenant. The same is applicable here. It is the Agreement standard that is applicable in assessing Sirona's conduct.

The Tribunal finds that there can be no recovery for  breach of the covenant of good faith and fair dealing.


## 4.  UNJUST ENRICHMENT

As Claimants correctly observe, unjust enrichment is a quasi-contractual theory of recovery to provide a remedy in the absence of a formal contract. The existence of an express enforceable contract that controls the parties' relationship defeats an unjust enrichment claim. *Alltrista Plastics, LLC v Rockline Industries, Inc.* 2013 WL 5210255 at *11 (Del.  Sup. September 4, 2013). The Tribunal finds

---

[6] Respondents point in their defense to various technical difficulties and deficiencies in the Apollo product itself after its launch which made sales difficult to impossible. However, the record shows that they were technical difficulties with Omnicam at the start as well, which Sirona took steps to address and resolve. Moreover, the record reflects that with proper training Apollo performed well. No adequate effort was put into Apollo to deal with the early technical issues or to assure appropriate training.

there can be no recovery on a claim premised on unjust enrichment on the facts presented here where a comprehensive Agreement governs the parties obligations.

## 5. FRAUDULENT INDUCEMENT

Claimants assert that Respondents fraudulently induced them to enter into the Agreement. They identify three separate significant misrepresentations or omissions. They allege that (a) Respondents believed the Revenue Earn Out was unachievable, but induced Respondents to enter into the contract by presenting a business plan that they knew at the time was false and misleading; (b) Respondents knew that Patterson would not distribute Apollo and was no longer interested in marketing to dental laboratories (the primary focus of the proposed marketing plan), yet did not disclose this information to Claimants; and (c) Respondents knew that they were developing a competing product that would be sold in the Digital Impression ("DI") space and would compete with Apollo for developmental and marketing resources, yet did not disclose the existence of Omnicam.

Respondents contend that the integration clause in the agreement bars the enforcement of a fraud claim. Respondents' Post-Hrg. Br. at 25–28. Delaware law does not support Respondents' position. In *Kronenberg v Katz,* 872 A.2d 568 (Del. Ch. 2004), the court discussed the clear distinction between a standard integration clause, and one which contains an anti-reliance provision. Delaware public policy is intolerant of fraud, and only if there is an express anti-reliance clause in the contract do the Delaware courts find that a fraud claim cannot be asserted. *Abry Partners v F & W Acquisition LLC,* 891 A.2d 1032, 1058-1059 (Del. Ch. 2006). The standard integration clause quoted in *Kronenberg*, which was found not to suffice as an anti-reliance clause, is virtually identical to the integration clause in the Agreement.

Nor does Respondents' argument that the language in section 3.04(h), which provides that Sirona is not providing "any assurance that the achievement of (i) financial results or (ii) that product development that would result in the payment of an earn out can or will occur," assist them. The provision simply means what it says, that Sirona is not guaranteeing that the earn out would be achieved. It does not, as required under Delaware law to bar actions for fraud, constitute an anti-reliance provision, i.e. a statement by Claimants that they are not relying on any projections delivered by Sirona.

The fraud claim is accordingly not barred. And the facts presented by Claimants are troubling. But before embarking on an analysis of whether or not liability can be found on the grounds of fraud, whether by commission or by omission, the Tribunal examines whether the damages would be different in any way if liability were based on fraud as opposed to breach of contract.

## VI. DAMAGES ANALYSIS

### a. Remedies Available

Damages for breach of contract are intended to place the damaged party in the same position as it would have been in had there been no breach. Damages are measured by an analysis of the "but for" world with a calculation of what the revenue earn out would have been had Sirona performed as required under the contract. Claimants cite to Mr. Klein's calculations of what the revenue earn out would have been in the "but for" world as support for their request for the quantum of damages for the asserted breach of contract. Claimants' Post-Hrg. Br. at 81. That is the correct approach.[7]

Contracts induced by fraud are voidable and rescission is available as a remedy for fraud. However, Claimants do not seek rescission here. While it may be that Respondents would be pleased to accept rescission and to be repaid the $21 million they paid for Arges, Claimants are not seeking rescission and they state that rescission is not possible. As Claimants stated:

> "[a]fter reviewing our submissions and the various agreements associated with the merger, Claimants will not be seeking rescission of the contract and a return of the IP; rather, Claimants are seeking money damages for the alleged breaches, frauds, and unjust enrichment in this case, as requested in the Second Amended Demand for Arbitration. The IP license agreement is an agreement to which the Claimants are not a party, so for the purposes of this arbitration, we only ask you to determine whether Claimants are entitled to money damages, and if so, in what amount.[8]

E-mail from Claimants' counsel Mr. Roesser dated October 19, 2015.

If rescission is not possible, as Claimants state "a party who has been defrauded may seek damages measured by the "'benefit of the bargain.'" citing *Tam v. Spitzer*, 1995 WL 510043, *12 (Del. Ch. 1995). Claimants' Post-Hrg. Br. at 68. The bargain here was that Sirona would "cause the Business to be conducted in good faith and … exercise its commercially reasonable efforts to promote the interests of the Business to achieve realization of the Revenue Earn-Out." Thus, determining damages for the fraud claim requires an analysis of the "but for" world to determine what the revenue earn out would have been had Sirona performed as required under the Agreement. Mr. Klein, Claimants' damages expert, presents

---

[7] Similarly, the court in *O'Toole v Genmar Holdings Inc.,* 387 F.3d 1188, 1206 (10th Cir. 2004), cited by Claimants, found that the correct measure of damages was what would have been earned if the purchase agreement had been properly performed by the buyer. The court  affirmed the jury's finding, based on the facts before it, that the plaintiff was entitled to only a portion of the $5.2 million earn out that the purchaser had assured the plaintiff was obtainable.

[8] The intellectual property that underlies the Arges technology is licensed by Cal Tech, a license that Sirona obtained through its acquisition of Arges.

31

the fraud damages as "benefit of the bargain" using precisely this analysis. Klein Report at 10 – 24. That is the correct approach. The bargain here was not a guarantee that the full revenue earn out would be achieved. In fact, there was a specific disclaimer of any such assurance in Section 3.04(h).

Claimants also urge that if rescission on a fraud claim is not possible, unjust enrichment can be applied as a remedy. The cases cited by Claimant seem to support the proposition that if rescission is not possible the courts have some flexibility in finding an alternative form of relief in cases of fraud. But the Tribunal rejects the notion that the cases support the kind of application of unjust enrichment Claimants urge here, which would entitle them to a recovery of between $39-51 million (Claimants' Post-Hrg. slide deck at 89) or $14-26 million more than they would have been entitled to at a maximum under the Agreement and, moreover, pursuant to a remedy which the case law does not permit where there is an applicable contract as there is here.

Even if one were to accept Claimants' statement of the law as accurate, there would be no recovery for Claimants on this basis. Unjust enrichment requires a loss to one and an unjust benefit to another in addition to no remedy at law. *Chester County Refuse authority v. BFI Waste Services of Pennsylvania,* 2015 WL 3528260 *5 (Del. Sup. June 1, 2015). The necessary gain and loss is not established by the evidence presented. Damages are not intended to create a windfall.

As discussed above, Claimants' statement is undisputed that they would not have entered into the agreement with Sirona or they would have restructured the deal if they had not believed Sirona's presentations to be honest. But there is no evidence that Sirona would have been willing to enter into a transaction with a larger upfront payment or otherwise restructured the deal in a way more beneficial to Claimants. Indeed the negotiating history makes it clear that Sirona expected a sharing of the risk of future revenues for the sums in excess of the up-front payment. That was why there was a revenue earn out. And the up-front payment actually went down from $25 million up-front in the LOI to a $21 million payment on closing plus the $3 million accuracy earn out plus $1 million left in the pot by Claimants towards the development of the product.

Nor is there any evidence that had Claimants not sold to Sirona, they would have done better. And that is what Claimants would have to demonstrate to show that they suffered a loss; just claiming that they would not have done the deal is not sufficient. There is no evidence introduced that there was another deal available to them with anyone else. Talks with Sirona started in 2009 and continued over a period of over a year before the LOI was signed granting Sirona exclusivity. Claimants had ample time to shop Arges to others. There was no evidence introduced of any competing offer.

Nor is there any evidence to suggest that Claimants could have succeeded by embarking upon marketing the Arges product on their own. The two year delay in getting to market was not Sirona's fault

but was caused largely by the Arges team's technical difficulties with the development of a workable product. There was no persuasive evidence offered that suggested that Arges would have gotten to market any sooner and by 2013 the market had largely turned to powder free and other more attractive features offered by competitors as discussed below. And Mr. Karpowitz, with whom Claimants had discussions about marketing to labs and with whom one could speculate they could have entered the market on their own, actually did enter the market selling competing 3Shape's DI product but did not have great success with it. Augins Tr. at 1568. There is no reason to believe Claimants would have done any better if they had embarked on selling the Arges' product themselves.

Claimants received $21 million and are being awarded damages in this arbitration. The Tribunal is not persuaded that Claimants would have done any better absent the transaction with Sirona and does not believe the result in this arbitration does not serve equally the equitable principles that underlie the willingness of courts to shape a remedy to provide relief for fraud when rescission is not available.

Nor does the other side of the equation hold up, that Sirona unjustly benefitted. Claimants assert that Sirona was unjustly enriched by virtue of the acquisition by preventing Arges from coming into the market as a low-cost competitor. Claimants cite in support of their quantification of damages Sirona's own assertion prior to the merger that the defensive value of the acquisition was $10-12 million per year. Mr. Klein, Claimants' expert, arrives at $64 million based on an assumption with no support in the record that Sirona increased its profits by 5 per cent annually. Klein Statement ¶¶29-34.

As discussed, the delay in Apollo's entry into the market was largely attributable to unexpected technical difficulties encountered by Claimants in the development of the product and not because of any misconduct by Sirona. That delayed the commencement of sales of Apollo until 2013, as opposed to 2011, the date contemplated during the contract negotiations. So there was no enrichment by virtue of the acquisition during those two years. Apollo was not in the market because the product simply wasn't ready.

By 2013, when Apollo launched, there were several other new entrants in the marketplace, also modestly priced and many were powder free which was more acceptable to the marketplace and had other attractive features. So, while Mr. Kucharszyk's reports suggest concern about the impact of dropping Apollo pricing on other high margin Sirona products, the evidence is insufficient to support the contention that the purchase of Arges actually enabled Sirona to protect its pricing in light of all these other low cost new entrants in the DI market or to quantify any such benefit in a way that rises beyond rank speculation.

Accordingly, on the facts here, and as Claimants' own expert presented the damages, any damages for fraud should be based on the "benefit of the bargain," i.e. what would have been earned by Claimants had Sirona performed as required under the Agreement.

Thus damages must be determined utilizing the same approach under either a fraud or a breach of contract theory. Since the Tribunal has found that Sirona breached its obligations under section 3.04(h) of the Agreement, the Tribunal need not resolve the question of whether Sirona should also be found liable for fraudulently inducing Claimants to enter into the Agreement.[9]

### b. Damages Calculation

For their damages calculation, Claimants presented the witness statement and testimony of Gordon Klein ("Mr. Klein"), a faculty member at UCLA's Anderson School of Management, a member of the California bar, a certified public accountant, and the author of text books and articles on professional topics including statistics, accounting, economics and managerial finance. Mr. Klein also serves as an arbitrator and has served many times as a consultant and expert witness.

Mr. Klein presented calculations based on the benefit of the bargain theory, what Claimants would have earned in the "but for" world if Sirona had complied with its obligations under the Agreement. Mr. Klein presents a series of possible calculations, all based on Sirona projections of Apollo sales.

 Based on the various assumptions, Mr. Klein's initial calculations ranged from a low of $7.8 million to a high of $54.5 million, subject to the $25 million cap less the amount paid to Claimants of $703,000. Mr. Klein did one set of calculations based on the 2011 projections presented to Claimants in the business plan and another set based on Sirona's internal projections. For each of those sets of numbers he extrapolated to include the year 2017 and to add global sales. Mr. Klein then compared Sirona's prediction in 2011 as to the growth of the market from 2011 to 2016 (based on CX24 as representing worldwide sales), to the growth rate predicted in an independent industry market report published in 2013, CX82, and made adjustments where Sirona's forecast differed from the market research. These damage analysis spreadsheets were annexed to Mr. Klein's expert report.

---

[9] In response to the Tribunal's inquiry as to whether Claimants wished to have a ruling on both contract and fraud claims if the Tribunal were to conclude that the damage analysis was the same for both theories, while Claimants' counsel clearly believed in the fraud claim and felt that the contract claim was infected with fraud, he agreed that Claimants didn't care what was decided if the Tribunal were to conclude in favor of Claimants but saw damages as requiring the same analysis whether based on contract or fraud. Tr. Post-Hrg. Argument at 2729 -2732.

Mr. Klein's initial projections assumed that sales commenced in January 2012, assumed CX 24 related to worldwide sales, did not apply a discount rate, and used a single market report to determine an adjustment to the growth rate when another was also available. The Tribunal requested that Mr. Klein prepare additional calculations for each scenario (a) using the average of the growth rates predicted in the two market reports on DI that were admitted in evidence to determine the growth rate adjustment, (b) assuming CX24 related to US sales only, (c) applying a 20% discount to the damages which were based on projections both for the whole period and just for 2015-2017, and (d) calculating the revenue earn out as commencing 12 or 18 months later. Mr. Klein prepared those additional calculations at the Tribunal's request and showed total damages ranging, depending on the assumptions, from $2.3 million to $44.8 million subject to the $25 million cap. These revised damages analysis spread sheets were delivered to the Tribunal by cover e-mail from Mr. Igyarto on behalf of Claimants on October 23, 2015.

### c. Projections as the basis for the damages analysis

Sirona contends that Claimants' reliance on sales projections for Apollo, concededly a new product and a different technology, for the calculation upon which damages was based, is too speculative and must be rejected as failing to meet the reliability requirements under Delaware law for expert testimony, citing, *inter alia, Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 592 (D. Del. 2004); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 293 (3d Cir. 2012); *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, C.A. No. 10605, 2015 Del. Ch. LEXIS 276, at *84 (Del. Ch. Oct. 30, 2015); *Amaysing Techs. Corp. v. Cyberair Communs., Inc.*, C.A. No. 19890, 2004 Del. Ch. LEXIS 72, at *17 (Del. Ch. March 3, 2005).

While Claimants are correct that projections are not to be automatically accepted without analysis as the basis for damages, nor are they to be automatically rejected in constructing the "but for" damages world. As the court stated in *ZF Meritor, LLC v. Eaton Corp.*, *supra* at 292,

> Plaintiffs are certainly correct that "internal projections for future growth" often serve as legitimate bases for expert opinions. *See LePage's,* 324 F.3d at 165; *Autowest, Inc. v. Peugeot, Inc.,* 434 F.2d 556, 566 (2d Cir.1970)* (holding that damages testimony was admissible because the financial projections on which the testimony was based "were the product of deliberation by experienced businessmen charting their future course"). Businesses are generally well-informed about the industries in which they operate, and have incentives to develop accurate projections. As such, experts frequently use a plaintiff's business plan to estimate the plaintiff's expected profits in the absence of the defendant's misconduct. *See Litigation Services Handbook: The Role of the Financial Expert* 24:13 (4th ed. 2007). However, there is no *per se* rule of inclusion where an expert relies on a business plan; district courts must perform a case-by-case inquiry to determine whether the expert's reliance on the business plan in a given case is reasonable.

Claimants' expert, Mr. Klein, relied on projections developed by Sirona itself to offer the damages calculations. Sirona's witnesses clearly demonstrated themselves at the hearing to be experienced businessmen, well-informed about the industry in which they operate. While the particular product in issue, Apollo, was new to the market, Sirona had many years of experience in the industry and was stipulated by the parties to be the market leader in CAD/CAM. Accordingly projections developed by Sirona personnel should not be rejected out of hand as being too speculative, but instead should be examined to determine whether reliance on them is reasonable. The Tribunal concludes that it is reasonable to do so and that had Sirona taken steps consistent with their obligation to act in good faith and exercised commercially reasonable efforts with respect to pricing and distribution of Apollo, sales of Apollo would have increased, at least somewhat.

Thus, the Tribunal will look at the various calculations performed by Mr. Klein which offer several potential liability calculations and draw its conclusions as to which factual predicates should be utilized as the underpinning for selecting the calculation that reflects the "but for" world in the market as it played out in fact in the real world to date.[10]

As the courts have said "[i]n constructing a hypothetical world free of the defendants' … activities, the plaintiffs are given some latitude in calculating damages, so long as their theory is not wholly speculative." *LePage's Inc. v 3M, et al*, 324 F. 3d 141, 166 (3d Cir. 2003), cited in *ZF Meritor, LLC v. Eaton Corp.*, *supra*. The Tribunal finds that the damages calculations provided by Claimants meet the Delaware law requirement that damages be shown with reasonable certainty." See e,g., *LaPoint v .Amerisourcebergen Corp.* , 2007 WL 2565709, at *9. (Del. Ch. 2007) ("To be entitled to compensatory damages, plaintiffs must show that the injuries suffered are not speculative or uncertain, and that the Court may make a reasonable estimate as to an amount of damages.  Yet such damages need not be demonstrated with mathematical accuracy: plaintiffs need only to lay a reasonable foundation by which the Court may estimate their loss.")

### i.   The Impact of Powderless DI and Other Features

Respondents take the position that there is no evidence that additional sales of Apollo could have been achieved because Apollo lacked features the market sought including a powderless system and one that projected images in color not black and white. Respondents point out that Claimants failed to

---

[10] The Tribunal notes that Sirona's expert, Dr. House, did not offer an alternative damage calculation and conceded that the calculations Sirona urges should have been performed were impossible to perform given the data available as Claimants' marketing expert testified.

consider the impact of DI with orthodontic capability which Apollo did not have.  Respondents contend that since Apollo's features were deficient, it was not an attractive DI option and that accordingly, Claimants failed to show that Apollo's sales would or could have been higher.  Respondents' Post-Hrg.Br. at 44 – 45.

The principal evidence with respect to Apollo's features centered on the fact that the operation of Apollo required powder unlike many of the other new entrants in the market from other companies in 2013.  The evidence supports Sirona's contention that the move to powder free DI would have significantly impacted Apollo's sales.  The market changed between 2011 when the projections were prepared and the Agreement was entered into, and mid-2013 when Apollo was finally released in the market.  As Mr. Licata testified:

> The market has definitely turned towards powder free. You know, Sirona isn't the only company with a powder free camera and the enthusiasm in the market is for powder free. In fact, if you show a system to a dentist, the first thing they'll ask you is: is it powder free."

CX10, at 160.

Mr. Licata captured the change in the market with his testimony that the market went "from being excited about powder free to really wanting powder free." Licata Tr. at 715.

The market research report entitled Digital Impressions Standalone Scanners Market issued by Transparency Market Research in 2014, which was relied upon by Claimants' expert in his revised analysis, identified the ability to take digital impressions without powder as "the likely driver of growth of the digital impressions sales." CX105 at 20. Indeed, the importance of powderless impressions as the reason for market growth was repeatedly mentioned in this major independent market study relied upon by Claimants. See *id.* at 47 ("powderless impressions which makes the process faster and less intrusive for patients"), 49 ("expected to show significant growth… owing to their properties, such as powder free scanning"), 53 ("growth will be mainly driven by the advantages, such as powder-free scanning"), 59 ( growth after 2013 "majorly due to developments such as powder-free scanning in new generation optical wand scanners"). Another market study relied on by Claimants issued by iData in September 2013 entitled Markets for Digital Impression Scanners describes the use of powder sprays as a "limiter" for the sales of the digital impressions systems.

Another market analyst reported in March 2013, as Apollo was being launched, that some of the "lower-priced" market entrants (priced about the same as Apollo at $20,000)  were powder free systems which "overcome[s] one of the biggest hurdles (the need for applying powder) we frequently hear from dentists when it comes to adopting this [DI] technology. CX15 at 8.

37

In further support of their position that there was no longer any interest in powder systems, Sirona recites their experience with American Dental Partners, which conducted a pilot program of digital impressions systems to determine which digital impressions system it would buy, anticipating buying 100 systems. During the course of the "bake-off" competition between six digital impressions systems which included Omnicam and Apollo, neither of the two powder based systems, Apollo and 3M's True Definition scanner, made it past the first round of the pilot. They attributed that result to the fact that there was no interest in a powder product. Rather, American Dental Partners elected to spend an extra $1.5 million dollars, to purchase 100 Omnicam units at $30,716 per unit (the price offered after Apollo was out of the running) rather than Apollo which was priced for ADP at $15,356 per unit. Augins Statement at ¶85.

As Mr. Kucharzyk reported in January of 2014: "they cannot sell Apollo DI because spraying is perceived as 'old technology.'" CX175. Even Claimants' expert agreed that for some dentists powder free is a must. Erdem Tr. at 1608.

All parties agreed that product features are important in the sale and marketing of any product. Mr. Kucharczyk identified other features in which Apollo was deficient compared to others in the market in the DI market review discussed above which discussed all three aspects that drive sales: distribution, pricing and technology. CX66 ("Apollo has some deficiencies… Camera head and the quality of the plastic… Use of powder… Ease-of-use of the software double structures and the scan… STL output quality, etc.).

The Tribunal concludes that Apollo lacked important features sought in the market and was not as high quality as other products. As one market report stated in March 2013 reporting on the IDS, the major international dental show at which Apollo was launched, we are "struggling to see anything that truly makes… Apollo… stand out from the products currently offered" by other companies, some are "head and shoulders above Apollo from a quality standpoint." RX1033.

The impact of the advent of powder free low-cost scanners in the marketplace and Apollo's other shortfalls must be considered in determining the revenue earn out in the "but for" world. The Tribunal recognizes that these deficiencies would have decreased the potential for sales of Apollo.[11] However,

---

[11] Claimants suggest that the Tribunal should consider the fact that cathode tube televisions succeeded on the market for years after the flat screen televisions were introduced as evidence that the Tribunal should conclude that Apollo's sales would not have been affected. The Tribunal does not find that analogy persuasive. Cathode tube televisions were in virtually every home and for years were less costly than the flat screens. DI had not yet been accepted by the market and Apollo was entering at the same time as other new entrants with better features comparably priced.

while the move to powderless was significant and other product deficiencies were problematic and would have reduced the sales that Sirona might otherwise have achieved with Apollo, Sirona was the leader in CAD/CAM and the Tribunal concludes that had Sirona offered a reduction in price, changed distribution, and made other efforts consistent with its commitment to take commercially reasonable actions in good faith comparable to those it took with its other products, it would have been able to achieve sales somewhat greater than those actually achieved.

### ii.  Selecting the base projections

Claimants urge the Tribunal to use the higher projections that were given to Claimants in the business plan in January 2011 as the basis for the damages analysis rather than the lower internal projections. The Tribunal does not find those higher projections to be realistic in light of the significant new market entries by other companies, with low priced products and with improved features over the Apollo product like powder free systems and color digital images.

The analysis that must be conducted as to what would have happened in the "but for" world takes as the hypothetical variable what Sirona's actions should have been but accepts what otherwise happened in the real world to date. Thus, the Tribunal concludes that analyses conducted by Mr. Klein based on the projections used by Sirona for internal purposes must be the ones to which the Tribunal looks. Those lower numbers more accurately reflect what could have been achieved in light of the entry into the market of others, and it appears better, competing DI products.

Accordingly, the Tribunal looks to Mr. Klein's calculations based on "earn out estimates based on internal Sirona projections"

### iii.  Delay adjustment

As discussed above, the Tribunal has concluded that the delay in the release of Apollo to the spring of 2013 was not Sirona's fault. There were technical difficulties in the development of the product by the Arges team and there were requirements which, while they were not necessary for Product Finalization from the perspective of the Accuracy Earn Out, were necessary before taking Apollo to market. Apollo was launched at IDS in March 2013. But sales did not commence until May and June of that year.

Mr. Klein's initial calculations contemplated revenues being generated as of January 2012. Mr. Klein's recalculations performed at the Tribunal's request showing revenues commencing after an 18

months delay more closely approximate when Apollo sales actually commenced and when the damages determination should start.

Accordingly, the Tribunal looks to Mr. Klein's calculations based on "assuming an 18 month delay of the Apollo release.

### iv.  Market Growth Adjustment

Mr. Klein used an independent market research report to assess market growth assumptions and adjust the market growth assumptions that Sirona had used in its internal projections. In his report, Mr. Klein used a single market research report. At the Tribunal's request, he recalculated those assumptions to arrive at the average market growth assumption based on the two available independent market research reports. CX71 and CA105. The Tribunal finds that using the average of the two market growth assumptions is more accurate than selecting a single market research report.

A factual issue presents itself with respect to the market growth adjustment which requires a decision as to whether the internal Sirona projections reflected in CX24, which form the basis of Mr. Klein's analysis as to Sirona's market growth assumptions, relate to U.S. only or global growth. This factual determination impacts the growth adjustment to the projections. Reading CX24 and the numbers in context in that document compels the conclusion that it relates to U.S. only sales. Mr. Klein's calculations that reflect a market growth adjustment using the Sirona growth numbers from CX24 as reflecting U.S. sales only is the correct analysis for the damages calculation.

Accordingly, the Tribunal looks to Mr. Klein's calculations, which calculate the growth adjustment based on the average of the two market research reports and based on $100M as reflecting U.S.-only sales.

### v.  Discount rate adjustment

The final variable in Mr. Klein's analysis that requires decision is with regard to the discount rate. There is no dispute that the discount rate of 20% which was utilized internally by Sirona for its projections on Apollo is appropriate. The question is to which years it should be applied. The Tribunal concludes that it is appropriate to utilize the calculations that apply a 20% discount to the forward looking projections for 2015 -2017 but not the prior years.

Accordingly the Tribunal looks to Mr. Klein's calculation, discounting only 2015 – 2017.

### vi. US and international markets

The Tribunal looks to Mr. Klein's calculations for earn out estimates for U.S. and international markets. Mr. Klein also performed various other calculations based on different hypotheticals relating principally to lab channels. The Tribunal does not find those additional calculations which, for the most part, lead to lower outcomes, are appropriate on the facts presented. While lab channels were intended to be the principal outlet for Apollo sales, Apollo sales were not restricted to labs.

## VII. DAMAGES AWARDED

With respect to Sirona's breach of the Accuracy Earn Out, Claimants are awarded $3,000,000 (Three million dollars).

With respect to Sirona's breach of the Revenue Earn Out, Claimants are awarded a total of $4,759,495, less the $703,569[12] earn out already paid to Claimants for a net sum of $4,055,927 (Four million fifty-five thousand nine hundred and twenty-seven dollars).

The sum of the 4,759,495 is reflected on Exhibit 8 prepared by Mr. Klein on October 23, 2015, and reflects the sum described as prepared based on the follow assumptions:

- Earn out estimates controlling for market growth.

- Assuming 18 month delay of Apollo release.

- ($100 million as reflecting U.S.-only sales)

- Earn out estimates based on internal Sirona projections.

- Earn out estimates for U.S. and International markets.

- Discounting only 2015 – 2017

Since no evidence was submitted as to when the Revenue Earn Out payments that were made were actually paid, for purposes of determining interest, the $703,569 is deducted equally from the prior three years on which payment is due (minus $234,523 from each year). Damages for past and future revenue earnings are awarded as follows:

---

[12] All amounts are rounded to the nearest dollar.

2013      $332,085 minus $234,523 equals $97,562

2014      $934,757 minus $234,523 equals $700,234

2015      $1,179,599 minus $234,523 equals $945,076

2016                              $1,201,499

2017                              $1,111,555

TOTAL                            $4,055,927

The Tribunal has discretion pursuant to AAA Rule 47 with respect to the setting of interest. This arbitration is governed by Delaware law, which provides for interest at the rate of 5% over a floating rate keyed to the Federal Reserve discount rate on breaches of contract. 6 Del. C. Sec 2301 (d); *Tekstrom, Inc. v Salva,* 2005 WL 3589401 (Del Ct. of Common Pleas 2005). The Tribunal concludes that is an appropriate interest rate to apply to the sums owing in this case and simple interest shall be applied at that rate as of the dates specified below.

In addition to the principal sum of $3,000,000 on the Accuracy Earn Out, Respondents shall pay prejudgment interest on the $3,000,000 at the Delaware statutory rate commencing on October 23, 2012, which is on or about the date Mr. Harvard conducted his accuracy test.

In addition to the principal sum of $4,055,927on the Revenue Earn Out Respondents shall pay interest on the following sums:

- Interest at the Delaware statutory rate on $97,562 commencing as of October 1, 2013; PLUS

- Interest at the Delaware statutory rate on $700,234 commencing as of October 1, 2014; PLUS

- Interest at the Delaware statutory rate on $945,076 commencing as of October 1, 2015.

## VIII. COSTS AND ATTORNEYS' FEES

Both parties seek recovery of their attorney's fees and costs. Section 11.16 of the Agreement provides:

The final award shall award to the prevailing party its reasonable attorneys' fees and costs incurred in connection with the arbitration to the extent the arbitrator deems the party to have

42

prevailed (but if the prevailing party is not awarded all of the damages sought, only to the extent, pro rata, of its award compared to the damages sought) and may grant such other, further and different relief as authorized by the rules of the AAA, including damages and out-of-pocket costs but may not award consequential, incidental or punitive damages (except to the extent such damages are paid to a third-party).

The parties, while invited to do so, waived the right to comment on the reasonableness of opposing counsel's attorney's fees. The Tribunal notes that the attorney's fees and costs incurred by both sides were comparable.

In accordance with the Agreement, Claimants are entitled to reasonable attorney's fees and costs on a pro rata basis comparing the amount awarded to the damages sought. In light of the many different amounts that Claimants, sought there is no one single way to approach the issue. The Tribunal concludes that Claimants should be awarded attorney's fees based on a comparison of the total principal sum of (a) $7,055,927 that has been awarded, against (b) the full revenue earn out of $25 million less the amount already paid of $703,569, plus the $3 million Accuracy Earn Out. In other words $7,055,927 divided by $27,296,430 or 26% (rounding up from .25849). Applying 26% to Claimants submission for fees and costs entitles Claimants to be reimbursed $876,194 (26% of $3,369,977) in attorney's fees and $211,378 (26% of $812,992) in costs for a total reimbursement for attorney' s fees and costs of $1,087,572.

## IX. RELIEF AWARDED

In making its findings and this Final Award, the Tribunal has considered the testimony, the witness statements and the documentary evidence and closely attended to the parties' oral and written arguments. Based upon this, the Tribunal **DECIDES** and **AWARDS** as follows:

1. The Tribunal finds in favor of Olav Bergheim and Morteza Gharib ("Claimants") and against Sirona Dental Systems, Inc. and Arges Imaging, Inc. ("Respondents") for breach of contract on the claim for the Accuracy Earn Out contained in the Agreement and Plan of Merger By and Among Sirona Dental Systems, Inc., AI Merger Corp., Arges Imaging Inc. and Representatives executed on May 5, 2011 (the "Agreement').

2. Respondents shall be jointly and severally liable and shall pay the principal sum of US$3,000,000 (Three million dollars) plus simple interest commencing on October 23, 2012, through the date of issuance of this Final Award at the Delaware statutory rate of 5% over the Federal Reserve discount rate (the "Delaware Interest Rate") and thereafter at the Delaware

43

Interest Rate or at such lower interest rate as shall be permitted by any enforcing court. Payment shall be made within 30 days of the issuance of this Final Award, by February 10, 2016.

3.  The Tribunal finds in favor of Claimants and against Respondents for breach of contract on the claim for the Revenue Earn Out contained in the Agreement.

4.  Respondents shall be jointly and severally liable and shall pay the total principal sum of US$4,055,927 (Four million fifty-five thousand nine hundred and twenty-seven dollars) plus simple interest at the Delaware Interest Rate on $97,562 commencing as of October 1, 2013 on $700,234 commencing as of October 1, 2014 and on $945,076 commencing as of October 1, 2015 until the date of issuance of this Final Award and thereafter at the Delaware Interest Rate or at such lower interest rate as shall be permitted by any enforcing court. Payment shall be made within 30 days of the issuance of this Final Award, by February 10, 2016.

5.  To the extent Claimants are owed a Revenue Earn Out payment for any Revenue Earn Out period, as set forth in Section 3.04(b) of the Agreement, and such Revenue Earn Out period post-dates the issuance of this Final Award, such Revenue Earn Out payment shall be offset by the particularized damages awarded by this Tribunal for that same Revenue Earn Out period.   Should the Revenue Earn Out for the relevant period exceed the damages awarded for the relevant period, the Revenue Earn Out payment due to Claimants shall be calculated by deducting the damages awarded from the Revenue Earn Out payment due.   Time and manner of the payments shall be consistent with Section 3.04 of the Agreement.

6.  The Tribunal finds that any damages to which Claimants might have been entitled pursuant to their claim of fraudulent inducement does not differ from the damages awarded for the breach of the Agreement with respect to the Revenue Earn Out since both would entitle Claimants to the same benefit of the bargain damages on the facts presented. Accordingly, the Tribunal makes no findings with respect to Claimants' allegations of fraudulent inducement.

7.  Claimants' request for relief for breach of the covenant of good faith and fair dealing is denied.

8.  Claimants' request for relief for unjust enrichment is denied.

9.  Respondents shall be jointly and severally liable and shall pay the principal sum of US$1,087,572 (One million eighty-seven thousand five hundred and seventy-two dollars) for Claimants' attorney's fees and costs in accordance with the Agreement. Payment shall be made within 30 days of the issuance of this Final Award, by February 10, 2016.

10. The administrative fees of the AAA totaling $26,600 (Twenty-six thousand six hundred dollars) and the compensation of the arbitrator totaling $130,906 (One hundred thirty-thousand nine hundred and six dollars) shall be allocated: Claimants shall bear 41% and Respondents shall bear 59%. Therefore, within thirty (30) days of issuance of this FINAL AWARD, by February 10, 2016, Respondents shall pay to Claimants the sum of $25,225.54 (Twenty-five thousand two hundred twenty-five dollars and fifty-four cents) representing a portion of the amount previously advanced by Claimants to the AAA.

11. This Final Award renders a final decision on the merits of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

I hereby certify that, for the purposes of Section I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, U.S.A.

Date:    January 11, 2016

Edna Sussman, Arbitrator

I, **EDNA SUSSMAN**, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my **FINAL AWARD**.

**DATE**

**EDNA SUSSMAN, ARBITRATOR**

State of New York

}  SS:

County of New York

On this 11th day of January, 2016, before me personally came and appeared **EDNA SUSSMAN,** to me known and known to me to be the individual described in and who executed this **FINAL AWARD** and acknowledged to me that she executed the same.

**DATE**

**NOTARY PUBLIC**

ELAINE LAPENNA
Notary Public, State of New York
No. 01LA6241936 New York
Qualified in Nassau County
Commission Expires May 31, 20__

46